UNITED STATES DISTRICT COURT WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MICHAEL ARVEY,

      Plaintiff,

v.

SANDRA LYNN FIELSTRA, FRUITPORT
COMMUNITY SCHOOLS, ROBERT
SZYMONIAK, ROBERT ROGERS,
LAUREN CHESNEY, and PROFESSIONAL
EDUCATIONAL SERVICES GROUP, LLC,
a Michigan Limited Liability Company,

      Defendants.

Case No:  1:18-cv-00185

HON. PAUL L. MALONEY

**ORAL ARGUMENT REQUESTED**

---

| | |
|---|---|
| Kevin B. Even (P38599) | Mark T. Ostrowski (P49761) |
| SMITH HAUGHEY RICE & ROEGGE | Jessica M. Stark (P80647) |
| Attorneys for Plaintiff | Bogomir Rajsic, III (P79191) |
| 900 Third St., Ste. 204 | KLUCZYNSKI, GIRTZ & VOGELZANG |
| Muskegon, MI 49440 | Attorneys for Defendants Fruitport CS, |
| (231) 724-4320 | Szymoniak, Rogers, and Chesney |
| keven@shrr.com | 5005 Cascade Road S.E., Suite A |
| | Grand Rapids, MI 49546 |
| | (616) 559-8600 |
| | marko@kgvlaw.com |

---

### DEFENDANTS', FRUITPORT COMMUNITY SCHOOLS, ROBERT SZYMONIAK, ROBERT ROGERS, AND LAUREN CHESNEY, MOTION FOR SUMMARY JUDGMENT

NOW COME defendants, Fruitport Community Schools, Robert Szymoniak, Robert Rogers, and Lauren Chesney, by and through their attorneys, Kluczynski, Girtz & Vogelzang, and hereby move this Court to enter an order for summary judgment pursuant to Fed.R.Civ.P. 56(c), dismissing plaintiff's complaint with prejudice for the reasons stated in the accompanying brief and exhibits.

KLUCZYNSKI, GIRTZ & VOGELZANG
Attorneys for Defendants

Dated: June 27, 2019                    By:   /s/ Mark T. Ostrowski
                                              Mark T. Ostrowski (P49761)
                                              Bogomir Rajsic III (P79191)
                                        Business Address & Telephone:
                                              5005 Cascade Road S.E., Suite A
                                              Grand Rapids, MI 49546
                                              (616) 559-8600

UNITED STATES DISTRICT COURT WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MICHAEL ARVEY,

     Plaintiff,

v.

SANDRA LYNN FIELSTRA, FRUITPORT
COMMUNITY SCHOOLS, ROBERT
SZYMONIAK, ROBERT ROGERS,
LAUREN CHESNEY, and PROFESSIONAL
EDUCATIONAL SERVICES GROUP, LLC,
a Michigan Limited Liability Company,

     Defendants.

Case No:  1:18-cv-00185

HON. PAUL L. MALONEY

**ORAL ARGUMENT REQUESTED**

---

Kevin B. Even (P38599)
SMITH HAUGHEY RICE & ROEGGE
Attorneys for Plaintiff
900 Third St., Ste. 204
Muskegon, MI 49440
(231) 724-4320
keven@shrr.com

Mark T. Ostrowski (P49761)
Jessica M. Stark (P80647)
Bogomir Rajsic, III (P79191)
KLUCZYNSKI, GIRTZ & VOGELZANG
Attorneys for Defendants, Fruitport CS,
Szymoniak, Rogers, and Chesney
5005 Cascade Road S.E., Suite A
Grand Rapids, MI 49546
(616) 559-8600
marko@kgvlaw.com

---

### BRIEF IN SUPPORT OF DEFENDANTS', FRUITPORT COMMUNITY SCHOOLS, ROBERT SZYMONIAK, ROBERT ROGERS, AND LAUREN CHESNEY, MOTION FOR SUMMARY JUDGMENT

KLUCZYNSKI, GIRTZ & VOGELZANG

By:    Mark T. Ostrowski (P49761)
       Bogomir Rajsic, III (P79191)
       Attorneys for Defendant
Business Address & Telephone
       5005 Cascade Road S.E., Suite A
       Grand Rapids, MI 49546
       (616) 559-8600

**TABLE OF CONTENTS**

TABLE OF CONTENTS ………………………………..……………………………….... i

INDEX OF AUTHORITIES........................................................................................ ii

    I.     INTRODUCTION ......................................................................................... 1

    II.    STATEMENT OF FACTS ........................................................................... 3

    III.   ADDITIONAL STATEMENT OF FACTS ............................................... 12

      A.  Michael's Deposition Testimony. ............................................................ 12

      B.  Testimony of Emily DePoy ..................................................................... 16

LAW AND ARGUMENT .......................................................................................... 17

    IV.   STANDARD OF REVIEW ......................................................................... 17

    V.    NO BASIS EXISTS FOR LIABILITY UNDER TITLE IX ....................... 18

      A.  Fruitport did not have "actual notice" until after Fielstra resigned. .............. 19

      B.  Fruitport was not deliberately indifferent to the information it received. ...................... 23

    VI.   THERE IS NO BASIS FOR INDIVIDUAL OR MUNICIPAL LIABILITY UNDER § 1983. 24

      A.  Michael cannot provide evidence to support his claim for individual liability.............. 24

      B.  Fruitport cannot be held liable under a *Monell* theory of recovery............................... 26

    VII.  NO BASIS EXISTS FOR LIABILITY UNDER ELCRA ........................... 29

    VIII.  FRUITPORT IS IMMUNE FROM MICHAEL'S TORT CLAIMS. ........................... 31

CONCLUSION ........................................................................................................ 33

CERTIFICATE OF COMPLIANCE ......................................................................... 34

# INDEX OF AUTHORITIES

**Cases**

*Campbell v. Dundee Community Schools*,
   661 Fed.Appx. 884 (6th Cir. 2016) ................................................................................. 24, 25

*Chambers v. Trettco, Inc.*,
   463 Mich. 297, 311 (2000) ...................................................................................................... 34

*Collette v. Stein-Mart, Inc.*,
   126 Fed.Appx. 678, 687-688 (6th Cir. 2005) ......................................................................... 34

*Connick v. Thompson*,
   563 U.S. 51, 61 (2011) ............................................................................................................. 31

*Davis v. Monroe Cnty. Bd. Of Educ.*,
   526 U.S. 629, 648 (1999) ......................................................................................................... 26

*Doe v. City of Roseville*,
   296 F.3d 431, 439 (6th Cir. 2002) ......................................................................................... 28

*Doe v. Claiborne Cnty., Tenn.*,
   103 F.3d 495, 513 (6th Cir. 1996) ........................................................................... 26, 28, 29, 30

*Ellis ex rel. Pendergrass v. Cleveland Min. School Dist.*,
   455 F.3d 690, 700 (6th Cir. 2006) ......................................................................................... 30

*Gebser v. Lago Vista Ind. Sch. Dist.*,
   524 U.S. 274, 280-81 (1998) ............................................................................................. 21, 22

*Gracey v Wayne County Clerk*,
   213 Mich App 412, 420 (1995) ............................................................................................... 35

*Hamed v. Wayne County*,
   490 Mich 1; 803 NW2d 237 (2011) ........................................................................................ 33

*Hedrick v. W. Reserve Care Sys.*,
   355 F.3d 444, 451 (6th Cir. 2004) ......................................................................................... 21

*Henderson v. Walled Lake Consolidated Schools*,
   469 F.3d 479, 490 (6th Cir. 2006) ......................................................................................... 22

*Irvin v. Grand Rapids Public Schools*,
   366 F.Supp.3d 908, 919 n.4 (W.D. Mich. 2016) ............................................................... 25, 26

*Klemencic v. Ohio State Univ.*,
   263 F.3d 504, 510 (6th Cir. 2001) ......................................................................................... 21

*Lash v Traverse City*,
   479 Mich 180, 195 n 33 (2007) .............................................................................................. 35

*Leary v. Daeschner*,
   349 F.3d 888, 903 (6th Cir. 2003) ......................................................................................... 27

*Mack v City of Detroit*,
   467 Mich 186, 198; 649 NW2d 47 (2002) .............................................................................. 35

*McCoy v. Bd. Of Educ., Columbus City. Schs.*,
   515 Fed.Appx. 387, 392 (6th Cir. 2013) ........................................................................... 26, 30

*McQueen v. Beecher Cmty. Schs.*,
   433 F.3d 460, 464 (6th Cir.2006) ........................................................................................... 32

*Monell v Dept. of Soc. Services*,
   436 U.S. 658, 691, 98 S.Ct. 2018, 2036 (1978) ..................................................................... 29

*Nawrocki v Macomb Co Rd Com'n*,
    463 Mich 143, 156 (2000) ................................................................ 34
*Robinson v City of Detroit*,
    462 Mich 439, 455 (2000) ................................................................ 35
*Smith v Kowalski*,
    223 Mich App 610, 616 (1997) ........................................................ 35
*Stiles ex rel. D.S. v. Grainger Cnty, Tenn.*,
    819 F.3d 834, 852 (6th Cir. 2016) .............................................. 28, 32
*Stringwell v Ann Arbor Pub Schs*,
    262 Mich App 709 (2004) ................................................................ 34
*Vance v. Spencer Cty. Public Sch. Dist.*,
    231 F.3d 253, 260 (6th Cir. 2000) .................................................. 26
*Williams ex rel. Hart v. Paint Valley Local Sch. Dist.*,
    400 F.3d 360, 363 (6th Cir. 2005) .............................................. 21, 30

**Statutes**
20 U.S.C. § 1681(a) ............................................................................. 19
MCL 37.2402 ....................................................................................... 30
MCL 691.1402 ..................................................................................... 33
MCL 691.1405 ..................................................................................... 33
MCL 691.1406 ..................................................................................... 33
MCL 691.1407(1) ................................................................................ 32
MCL 691.1407(4) ................................................................................ 33
MCL 691.1413 ..................................................................................... 33
MCL 691.1417 ..................................................................................... 33

## I.     INTRODUCTION

Plaintiff, Michael Arvey, engaged in a sexual relationship with Sandra Fielstra, an employee of Professional Educational Services Group ("PESG").  Fielstra was assigned by PESG on a contract basis to Fruitport Community Schools ("Fruitport") to work as a secretary in the high school guidance office.  Fielstra commenced her assignment with Fruitport in September, 2014 and quit on May 12, 2015, after being confronted with discrepancies on her time card.  Ms. Fielstra had no criminal history and the school district and her employer, PESG, had no basis to know she was likely to engage in an inappropriate relationship with a student.

The only indication of any inappropriate conduct by Fielstra, prior to May 12, 2015, was a telephone call from a community member named Scott Wahr to the school late in the afternoon of April 27, 2015, reporting that Fielstra was observed parked in a car in front of the Wahr home, which is near Michael's residence, with Michael.  Mr. Wahr spoke with Fruitport High School Principal, Lauren Chesney.  Mr. Wahr saw plaintiff and Fielstra together in Fielstra's car on the afternoon of Saturday, April 25, 2015.  Mr. Wahr went out to the car and spoke with Fielstra. She identified herself as a Fruitport employee and indicated she was giving Michael a ride home. Mr. Wahr did not observe any physical contact between Arvey and Fielstra and they were fully clothed and not disheveled during the encounter.

On April 28, 2015, Ms. Chesney and Fruitport Superintendent Robert Szymoniak, interviewed both Michael and Fielstra separately regarding Mr. Wahr's report.  During the interviews, both presented the same story: Fielstra was a family friend who was giving Michael a ride home and returning a cell phone charger.  At the time, neither Superintendent Szymoniak nor Ms. Chesney had any reason to doubt their stories.  Nevertheless, Ms. Chesney contacted Suzanne Arvey, Michael's mother, out of an abundance of caution.  Ms. Chesney explained the circumstances and asked whether Mrs. Arvey was aware of plaintiff spending time with Fielstra.

Mrs. Arvey told Ms. Chesney she would ask Michael about the school's concerns.  On May 1, 2015, Mrs. Arvey reported to Ms. Chesney that she questioned plaintiff extensively and looked through Michael's phone, but found nothing of significance.  **Mrs. Arvey told Principal Chesney there was no reason to suspect anything inappropriate.**

Eleven days later, on May 12, 2015, Fielstra resigned from her assignment at Fruitport after being questioned about the falsified timecard.  Fruitport did not learn of Fielstra's relationship with Michael until **August of 2015** when the Fruitport Police Department contacted school administrators after Michael's father contacted the police.

Michael now brings this action against Fruitport, Superintendent Szymoniak, Ms. Chesney, and Fruitport High School Vice Principal Robert Rogers alleging violations of Title IX, § 1983, ELCRA, and negligence.  There is no merit to Michael's claims.  There is no basis for the school district or its employees to be held responsible for the inappropriate relationship because they did not have notice.  It was not until the police became involved – several months after Fielstra left her assignment at the school district – that the district learned of the relationship.  There is no evidence of deliberate indifference.  When Fruitport learned that Michael and Fielstra had been observed together off campus, they investigated the allegations. Michael, Fielstra, and Michael's family all denied there was any reason for concern.

Because Fruitport was not deliberately indifferent, there is no basis for liability under § 1983.  Additionally, Michael cannot establish a *Monell* claim against Fruitport.  He has not adduced any evidence that Fruitport's training was inadequate or that there was a pattern of constitutional violations at Fruitport.

Finally, Michael's state-law claims are legally insufficient.  Fruitport is not liable for Fielstra's misconduct.  Michael cannot present evidence of a hostile environment claim.  He was

a willing participant in his affair with Fielstra and Fruitport had no notice of the relationship. Michael's negligence claim against Fruitport is legally infirm because he has not alleged an exception to governmental immunity.

Fielstra engaged in criminal activity with Michael.  She is currently in prison for her crimes.  However, Fruitport and its employees had no reason to know of the affair at a time in which they could have intervened.  There is no cognizable claim Michael can establish against Fruitport and its employees.

## II.   STATEMENT OF FACTS

Fielstra, a PESG employee, began her assignment at Fruitport in September, 2014 and resigned on May 12, 2015.  She was assigned to work as a secretary in Fruitport High School's guidance office.  She worked from 9:00 A.M. to 12:00 P.M.  As a secretary in the guidance office, she was responsible for handling clerical duties (i.e., answering phones, processing transcripts, and managing the comings and goings of students in the guidance office) and providing support for guidance counselors Pam Riley and Lois Eich.  (Exhibit A, Dep. of M. Arvey at 38-39; Exhibit B, Dep. of L. Chesney at 13-15; Exhibit C, Affidavit of L. Chesney; Exhibit D, Dep. of S. Fielstra at 70).

Michael claims he met Fielstra in January, 2015 in the guidance office.  He testified that the first time he met her, Fielstra forged his father's signature on a document because Michael waited until the last minute to file a form.  After their first meeting, Michael found Fielstra's phone number on Facebook and the two began to text each other regularly.  At some point between the end of January, 2015 and February 28, 2015, Michael and Fielstra began to share sexually explicit text messages.  Michael testified that he first had sex with Fielstra on February 28, 2015 at Spring Lake Park in the back of her car.  He had no reason to believe anyone saw them having sex.  Michael testified that he told his neighbor and five of his closest friends of his

contact with Fielstra.  Michael's neighbor was not a student at Fruitport.  His five friends were.

He testified that after February 28, 2015, he and Fielstra would have sex daily.  Fielstra testified

she never had sex with Arvey before she resigned from her employment at Fruitport.  She

testified the sexual relationship did not begin until the summer of 2015 and that it continued until

2017.  No Fruitport employee was aware of their tryst.  Michael and Fielstra engaged in a

concerted effort to hide their actions.  (Exhibit A at 36-46, 50-51, 58-59; Exhibit D at 20, 45, 70).

In April, 2015, approximately one week before prom (which was held on April 25, 2015),

Michael was discovered off campus during the lunch hour.  Fruitport High School has a closed

campus policy for underclassmen.  Therefore, Michael was not permitted to leave campus during

lunch.  He was caught reentering the building and detained.  Ms. Chesney searched Michael's

belongings to determine whether he was in possession of any contraband, such as cigarettes.

Pursuant to school policy, assistant principal Robert Rogers, was present during the search.  Ms.

Chesney located several lighters and some skin moisturizer or hand lotion from Bath & Body

Works.  Ms. Chesney thought it was odd that Michael, a high school male, would have lotion in

his backpack.  She asked Michael why he had the lotion, to which he responded that it was a gift

for Mother's Day.  (Exhibit B at 42-43; Exhibit C; Exhibit E, Affidavit of R. Rogers).

While Ms. Chesney was searching Michael's backpack, his cellphone was placed face up

on a desk in the office.  At some point during the search, a message appeared on Michael's

phone.  There was no text visible, just the name of the person sending the message.  According

to Ms. Chesney and Mr. Rogers, the name that appeared was "Sandy" or "Sandra."  Michael

claims the notification that appeared was from "Sandy Fielstra."  Ms. Chesney avers that she did

not have reasonable suspicion to search Michael's phone.  On the other hand, Michael testified

that Ms. Chesney asked him for permission to look through his phone.  Either way, his phone

4

was never searched because Arvey refused.  Ms. Chesney testified that at the time, she was not concerned by the notification because she was focused on determining whether Michael had any contraband in his backpack.  Chesney called Mrs. Arvey to notify her that she had searched Michael's backpack.  (Exhibit B at 42-43; Exhibit A at 84-87; Exhibit C; Exhibit E).

Fruitport's prom was held on Saturday, April 25, 2015.  On Monday, April 27, 2015, Ms. Chesney received a telephone call from a community member, Scott Wahr.  Mr. Wahr told Ms. Chesney that he saw a car sitting on the side of the road in front of his house the previous Saturday during daylight hours.  According to Mr. Wahr, when he went out to the car, he discovered Fielstra and Arvey sitting in the car.  Michael and Fielstra both testified that when Mr. Wahr approached the car, Fielstra identified herself as a school employee and told Mr. Wahr she was giving Arvey a ride home.  (Exhibit C; Exhibit D at 17-19; Exhibit A at 111-112).

Fielstra was supposed to serve as a chaperone at prom.  As an underclassman, Michael did not attend prom.  Mr. Rogers and Ms. Chesney observed that Fielstra arrived late to prom that evening.  Her late arrival did not concern them because, as a volunteer chaperone, Fielstra was not even required to show up.  Neither Mr. Rogers nor Ms. Chesney had any reason to suspect she was late to prom because she was with Michael.  Fruitport did not receive Mr. Wahr's phone call until **the Monday after** prom. (Exhibit A at 112; Exhibit B at 34-35, 37-38; Exhibit D at 18-19; Exhibit F, Dep. of R. Rogers at 9-10).

After receiving the report from Mr. Wahr, Ms. Chesney contacted Superintendent Szymoniak for advice on how to proceed.  She thought it was concerning that a staff member was transporting a student on the weekend.  However, based on Mr. Wahr's report, she was not concerned that there was an inappropriate relationship.  Superintendent Szymoniak echoed Ms. Chesney's concerns regarding a school employee being alone in a car with a student.

5

Superintendent Szymoniak, however, did want to confirm there was no inappropriate relationship.  (Exhibit C; Exhibit G, Dep. of R. Szymoniak at 9-10; Exhibit H, Affidavit of R. Szymoniak).

Superintendent Szymoniak scheduled a meeting for 10:30 AM on April 28, 2015 to interview Fielstra.  The meeting could not be scheduled earlier because Ms. Chesney did not receive Mr. Wahr's call until late in the day on April 27, 2015.  Superintendent Szymoniak and Ms. Chesney interviewed Fielstra.  Superintendent Szymoniak testified that Fielstra looked anxious during the interview, but not more so than many school employees unexpectedly called to his office.  Superintendent Szymoniak asked Fielstra why she was alone in a car with a student.  Fielstra said she was giving Michael a ride because she was a family friend and was returning a cell phone charger to Michael.  Neither Superintendent Szymoniak nor Ms. Chesney had any reason to disbelieve Fielstra's story.  Superintendent Szymoniak testified that he found Fielstra's explanation of events to be plausible.  He told Fielstra that she should not put herself in a situation where she was alone with a student.  (Exhibit B at 31-33, 40; Exhibit D at 48-50, Exhibit G at 9-12, 18-20; Exhibit C; Exhibit H; Exhibit I, Calendar Invitation).

Immediately after completing Fielstra's interview, Superintendent Syzmoniak and Ms. Chesney interviewed Michael.  As Superintendent Szymoniak testified, his mindset following Fielstra's interview was "trust but verify."  Michael told them that Fielstra was a family friend and was giving him a ride home and returning a cell phone charger.  It did not concern Superintendent Szymoniak that Michael's story matched Fielstra's.  During the interview, Michael told Superintendent Szymoniak and Ms. Chesney that his family did not get along with Mr. Wahr.  Ms. Chesney did not doubt Michael's story, but told him that she would contact his mother about the report.  (Exhibit G at 18-20; Exhibit C; Exhibit H).

6

Michael freely described his defiant behavior toward Fruitport's attempts to gather information regarding Mr. Wahr's report during his deposition:

> Q [Mr. Ostrowski]:   All right.  And you told [Ms. Chesney] – you gave her an explanation as to why you and Sandy were parked in front of the Wahr house, correct?
> A:   Yeah.  I said she gave me a ride and she pulled over to grab something.
> Q:   Okay.  Did you tell her anything else?
> A:   I don't think so.
> Q:   Did you tell her that Sandy was returning a charger for you?
> A:   I might have said that she was giving me one of them portable chargers, like I said earlier.
> Q:   All right.  Did you tell Lauren Chesney where you were coming from that Sandy was giving you a ride?
> A:   I don't remember.  See, I don't remember telling her where I came from. She wasn't even focused on that.  I don't think she asked me where I came from.  All I told Lauren Chesney was I was giving her a ride, and she wanted to focus on the relationship and the nature of the situation, what was happening like between us.  She said, "Well why were you guys together?"  "She gave me a ride."  She didn't even ask "Where did she give you a ride from?"  She said, "What were you guys doing? Where is she giving – where were you guys going?"  She asked that.  And I was like, "She's just dropping me off."
> Q:   Did she ask to look through your phone at that time?
> A:   For sure.
> Q:   And you said –
> A:   100 percent.
> Q:   And you said no, correct?
> A:   I said hell no.  Hell no.

(Exhibit A at 118-119).

After the interviews, Ms. Chesney contacted Michael's mother, Suzanne Arvey, to notify her of the situation.  Ms. Chesney made the decision to relay the information given that the events occurred outside of school hours.  She spoke with Mrs. Arvey on at least two occasions following Michael's interview.  During the first phone call, Ms. Chesney explained the report she received from Mr. Wahr and that she had interviewed Michael.  Ms. Chesney asked that Mrs. Arvey look at Michael's phone based on seeing the name "Sandy" appearing on Michael's phone during the search of his backpack.  Ms. Chesney believed that Michael's family would be able to

collect information that was beyond her authority.  However, as soon as Ms. Chesney mentioned that the report originated from Mr. Wahr, Mrs. Arvey told Ms. Chesney to not "believe anything" that Mr. Wahr says because Mr. Wahr is known to be an antagonist in the neighborhood.  Despite Mrs. Arvey telling Ms. Chesney to not believe Mr. Wahr's report, Ms. Chesney advised Mrs. Arvey that she should speak with Michael regarding the report.  At this time, Mrs. Arvey agreed to search Michael's phone.  (Exhibit B at 44-45; Exhibit J, Dep. of Suzanne Arvey at 66-68, 70-71; Exhibit C).

Mrs. Arvey spoke with Michael following Ms. Chesney's call.  Michael told his mom nothing was happening between he and Fielstra and that she was merely returning a phone charger when Mr. Wahr approached the car.  (Exhibit J at 68-69)

Mrs. Arvey described her conversation with Michael:

A:     So I sat down with Michael, and I said, you know, I talked to the school and let them know that she was just returning a charger, but they're telling me that you sat in that car for over 20 minutes with this lady; is that true?
         He's like, no, that's not true.  That's just that stupid neighbor.
         And I go, they also seem to think that she was trying to contact you in the office.
Q:     Right.
A:     So why don't you sit down with me and show me your phone, and show me around.  Show me who you're talking to.  You're not talking to her, are you?
         And he's like, no.
         So he showed me around in his phone, but he was really distraught that they had me go through his phone and burst out crying telling me the school was trying to make him look like a freak.
Q:     Okay.
A:     Make them leave me alone.  They're making me look like a freak.
Q:     Okay.
A:     And I believed my son.  I had no reason not to.  I didn't have the proper wherewithal to go through his phone, and again, we have this neighbor involved that's involved in everything that is no good for anybody around here.  All he does is report people.
Q:     Right.
A:     So who am I going to believe, the report he called into the school?  So I didn't really think anything more of it after that.

(*Id.* at 72-73).

On May 1, 2015, Mrs. Arvey spoke with Ms. Chesney regarding her conversation with Michael.  Ms. Chesney described Mrs. Arvey's tone as accusatory in nature during the second phone call and that it seemed Mrs. Arvey was upset at Ms. Chesney for questioning Michael's story.  (Exhibit C).  Mrs. Arvey testified regarding the second phone call with Ms. Chesney:

> A:   So I talked to Lauren Chesney one more time and I told her just that, what I just told you.
> Q:   Yep.
> A:   I said, I didn't see anything in his phone.  I see kids' names.  He pulled up a thing with a couple of sentences from kids, kids talk.  I go, but again, I don't really know how to look in that, but what he showed me I had to rely on him to show me.  I didn't see anything in there.  And the neighbor's report, he reports everything how do I know that that's, you know.
>
> *          *          *
>
> Q:   But your last phone call with Lauren Chesney you told her you had spoken to Michael, asked him about his phone, had tried to look through his phone –
> A:   I did.
> Q:   – and you concluded that you believe your son and you told Lauren that, correct?
> A:   I did.
> Q:   And that was the last conversation you had with Lauren regarding Michael and Sandy Fielstra, correct?
> A:   It was.

(Exhibit J at 73, 75).

Ms. Chesney e-mailed Superintendent Szymoniak to advise him of the results of the phone call.   As a result of this information, Superintendent Szymoniak and Ms. Chesney determined there was no reason to continue the investigation.  (Exhibit K, Email chain dated May 1, 2015; Exhibit C; Exhibit H).

Fruitport made a staffing decision during the spring semester of the 2014-2015 school year to eliminate Fielstra's position in the guidance office.   This decision was financially

motivated and was to be completed by moving a part time employee to full time and combining the two positions.  However, this restructuring was not set to go into effect until after the conclusion of the 2014-2015 school year.  (Exhibit C; Exhibit G at 14; Exhibit H; Exhibit L, Email from B. Szymoniak, 4/30/2015).

During the intervening time period, Fruitport was experiencing issues with Fielstra's job performance.  Ms. Chesney received complaints from Ms. Eich and Ms. Riley, the high school's guidance counselors, about Fielstra's job performance.  Ms. Eich and Ms. Riley complained that Fielstra often erred in processing transcripts, a vital job duty of the guidance office secretary. Additionally, Ms. Chesney received complaints that students were spending too much time in the guidance office when Fielstra should have sent them back to class if no guidance counselor was available.  (Exhibit B at 27-30; Exhibit C).

Finally, on May 8, 2015, Fruitport discovered that Fielstra had falsified one of her timecards.  As a result of these accumulating issues, Ms. Chesney met with Fielstra on May 11, 2015 to discuss her job performance.  Ms. Chesney emailed Fielstra following that meeting to confirm a number of details they discussed.  After a brief exchange, Fielstra resigned on **May 12, 2015**.  Superintendent Szymoniak, Ms. Chesney, and Ms. Rogers testified they have no reason to believe that Fielstra ever set foot back on Fruitport's campus following her resignation.  (Exhibit M, Email from L. Chesney to Fielstra, 5/8/2015; Exhibit N, Email chain between L. Chesney and S. Fielstra; Exhibit C; Exhibit H; Exhibit E).

Fruitport did not learn of Michael's sexual relationship with Fielstra until August 24, 2015, at the earliest, when Michael's father, Shawn Arvey, first reported the matter to the Fruitport Police Department.  By that time, Fielstra had not been employed by the district for over three months.  Even after Mr. Arvey reported to the Fruitport Police Department, Michael

lied to the police about when his relationship with Fielstra began.  He claimed they did not begin having sexual relations until after she left her assignment at Fruitport.  (Exhibit O, Dep. of Shawn Arvey at 25-27; Exhibit B at 20-21; Exhibit C; Exhibit E; Exhibit H; Exhibit A at 52-53).

Ms. Chesney testified that if she had learned that Fielstra was engaged in a sexual relationship with a student, she would have immediately contacted Superintendent Szymoniak and reported the matter to either the police or child protective services.  She testified she never saw Michael and Fielstra together and never saw Fielstra have any interactions with any student that caused concern.  (Exhibit B at 60-61).  Additionally, Ms. Chesney testified:

> Q:   During the '14-15 school year, you would see [Michael] periodically, I presume?
> A:   Yes.
> Q:   Did he ever come up to you and say, "I got a real issue going on with Ms. Fielstra"?
> A:   No.
> Q:   And to the best of your knowledge, did he go to the counselors and say, "I am suffering from some type of mental condition or emotional condition" as a result of his interaction with Ms. Fielstra?
> A:   No.
> Q:   Not that you can always spot it on somebody's face, but when you would see Mr. Arvey, would you look at him and go, "Something looks off with him, he looks down" or "he looks out, he looks like he is troubled"? Anything like that that comes to mind for you as you sit here today?
> A:   No.
> Q:   How about Mr. and Mrs. Arvey, had you ever spoken to them?
> A:   About –
> Q:   Before the '14-15 school year.
> A:   Yes.
> Q:   Okay, had they ever raised any concern about their son, all the way up until his very last – strike that, take it back this way.  Up until the last date that Ms. Fielstra was working here at the district, did Mr. and Mrs. Arvey ever say, "We got a concern something is going on with our son"?
> A:   No.

(*Id.* at 55-56).   Superintendent Szymoniak and Ms. Chesney testified that, at the time, the information they received indicated that Fiesltra may have engaged in the unprofessional practice of transporting a student outside of school hours.  However, they had no reason to believe

anything inappropriate was occurring until August of 2015 at the earliest – months after Fielstra resigned from her assignment.  (Exhibit C; Exhibit H).

After the news became public in August, 2015, Michael continued his enrollment at Fruitport but attended few classes.  Mr. Rogers contacted Mrs. Arvey to try and convince Michael to come back to school.  Mr. Rogers wanted Michael to continue his education.  At that time, Mrs. Arvey told Mr. Rogers that Michael was living with Fielstra and the two considered moving Michael's bus stop to Fielstra's house.  Mr. Rogers did not recall if the stop was moved. Unfortunately, Michael did not return.   In November, 2015, Mr. Rogers filed a report of suspected child abuse or neglect with the Michigan Department of Health and Human Services based on the suspected sexual relationship between Michael and Fielstra.  (Exhibit E).

## III.   ADDITIONAL STATEMENT OF FACTS

### A.   Michael's Deposition Testimony.

Michael actively tried to hide his relationship with Fielstra from his parents, Fruitport staff, and law enforcement.  He lied to law enforcement multiple times regarding when the relationship began.  Apparently, the only people he discussed it with were his close friends. While he claims that rumors of his relationship "swirled" immediately, he offered no testimony regarding the details of these alleged rumors.  He claims he and Fielstra had sex on one occasion in the school parking lot and that he kissed her at the top of the library a couple of times.  He admitted he had not reason to believe anyone saw him and Fielstra kiss in the library or having sex in her car.  (Exhibit A at 52-55, 58-60).

Michael claims that Fruitport staff was aware because they treated him differently after he began his relationship with Fielstra.  He testified that he believed a "couple" of teachers "had an idea" that there were rumors about the relationship.  He testified that his chemistry teacher, Mr. Stebelton, gave him "dirty looks" and treated him differently than before the relationship

began.   Michael claims that Mr. Stebelton was a "gossipy" teacher who often talked with students.   Michael testified that he saw students look at him while talking with Mr. Stebelton. However, he did not hear the conversation and was never apprised of what was said. Additionally, Michael testified that he could not remember when he thought Mr. Stebelton became aware of the rumors.   He was unsure whether this occurred before or after Fielstra left her employment with Fruitport.   (*Id.* at 63-68).

Michael also claims that his choir teacher, Mr. Showich, knew of the relationship because he saw a group of girls talking with Mr. Showich and they "all looked back" at him.   Michael did not know who the students were nor did he hear what the group was talking about.   Finally, he asserts his Spanish teacher, Ms. Ruch, was aware because he, again, observed a group of students talking to her.   He claims he heard them mention his Spanish name "Pedro."   He did not hear any part of the conversation.   Michael claims the next day, Ms. Ruch talked to him and asked if everything was okay.   He assured her nothing was wrong.   He testified that he chose not to tell her what was going on even though he knew she cared about him.   (*Id.* at 93-99).

Michael testified that Ms. Riley and Ms. Eich saw him interact with Fielstra on multiple occasions.   He claims they asked Fielstra why Michael was always coming to the guidance office.   However, according to Michael, Ms. Riley and Ms. Eich were not suspicious about a potential relationship but that Michael might have been a drug dealer.   He admits he has no reason to believe Ms. Riley and Ms. Eich had any information that he and Fielstra were engaged in an inappropriate sexual relationship.   (*Id.* at 78-79).

Michael claims that Ms. Chesney should have been aware of the relationship before prom in 2015.   Michael testified that during the search of his backpack following the closed campus violation, Ms. Chesney did not actually uncover hand cream from Bath & Body Works but

13

actually "sex lotion" that he bought to use with Fielstra.  Michael lied to Ms. Chesney when she asked him about it and told her it was a gift he bought for his mother.  Michael could not remember the name of the product, but claims it was from Victoria's Secret.  He agreed it was entirely plausible that Ms. Chesney could have believed the lubricant was for his use with a teenage girl.  Despite that, Michael claims Ms. Chesney should have known he was lying because of the inchoate "rumors" around the school.  (*Id.* at 79-86).

Michael recalled Feilstra's conversation with Mr. Wahr on the day of prom in April, 2015.  Michael and Fielstra were parked on the side of the road near Mr. Wahr's house.  According to Michael, they had just finished having sex at a different location.  When Mr. Wahr approached, it was still daylight and Fielstra was fully clothed and not disheveled.  Fielstra told Mr. Wahr that she was a school employee and that she was giving Michael a ride home.  Michael agreed that Mr. Wahr would have no reason to believe he and Fielstra just had sex.  (*Id.* at 111-114).

Michael testified regarding his meeting with Ms. Chesney following Mr. Wahr's report.  Ms. Chesney told Michael she received a call from Mr. Wahr.  Ms. Chesney questioned Michael about the report.  Michael denied the relationship.  He told Ms. Chesney that Fielstra had given him a ride home and pulled over grab something.  He admits he may have told Ms. Chesney that Fielstra was returning a cell phone charger.  Michael testified that Ms. Chesney asked for permission to look at Arvey's phone, but he refused.  Ms. Chesney apparently told Michael she would call his parents if he continued to refuse a search of his phone.  He did not relent.  (*Id.* at 117-120, 125-126).

After Ms. Chesney contacted Mrs. Arvey, Michael showed his mom his phone but actively concealed any evidence of his contact with Fielstra.  He convinced his mother there was

nothing improper happening between him and Fielstra:

> Q: And you basically convinced [Mrs. Arvey] that there was nothing on your phone, correct?
> A: (Nodding).
> Q: Is that a yes?
> A: My mom, yes.
> Q: And you convinced your mom that you were not having any sort of an improper relationship with Sandy Fielstra, correct?
> A: Yes, sir.
> Q: All right. And your mom actually called the school and spoke to Ms. Chesney and told her that she didn't think there was anything going on between you and Fielstra, correct?
> A: She said she didn't think there was anything going on, but – yeah, I think that's what she said.

(*Id.* at 120-122).

Michael had no reason to believe that Superintendent Szymoniak was aware of his relationship with Fielstra. Superintendent Szymoniak did not do or say anything to Michael that made him believe he was aware. (*Id.* at 133-134).

Michael claims that students harassed him about his relationship with Fielstra. The majority of the comments were made apparently online. However, he claims that on two occasions, students harassed him in school. He claims that while Fielstra was still working at Fruitport, a "freshman with blond hair" made fun of him about having sex with an older woman. The second time, a student commented that Michael could not justify his relationship with an older lady. Michael admits he did not report either instance to a Fruitport employee. (*Id.* at 131-133).

The Fruitport Police Department was alerted to the potential relationship between Michael and Fielstra in August of 2015. Even after the police investigation began, Michael actively hid the relationship from law enforcement. Michael told the investigating officer that he did not have sexual relations with Fielstra until after she left her employment with Fruitport. (*Id.*

15

at 76, 173-174).

After Fielstra resigned, Michael continued to attend classes at Fruitport.  However, in the fall of 2015, Michael only attended class on a handful of occasions.  Michael agreed that Mr. Rogers attempted to talk Michael into returning to school.  Unfortunately, he never did.  (*Id.* at 129-130).

      B.      <u>Testimony of Emily DePoy</u>

On March 18, 2019, Emily DePoy, a former Fruitport student, executed an affidavit describing what she claimed was notice provided to Fruitport administrators in "early 2015" of the alleged relationship between Michael and Fielstra.  However, during DePoy's deposition, she contradicted the claims made in her affidavit.  (Exhibit P, Affidavit of E. DePoy; *See* Exhibit Q, Dep. of E. DePoy).

It is undisputed that DePoy wrote a letter to Mr. Rogers.  The letter is dated October 8, 2015, or nearly two months after the Fruitport Police Department began its investigation.  At that point in time, Fielstra had not worked at the district for approximately five months and the administration was well aware of Michael's allegations.  DePoy testified that the date on the letter, October 8, 2015, was accurate.[1]  She described placing it in Mr. Rogers' school mailbox the same day she wrote it.  On that same day, she met with Mr. Rogers about her letter in his office.  Mr. Rogers explained that Fruitport was already aware of the allegations and the situation was being managed.  At the time DePoy wrote her letter, she was not aware Fruitport had already participated in the police department investigation.  (Exhibit Q at 26-28; Exhibit R, October 8, 2015 letter from E. DePoy).

---

[1] DePoy testified that at the time she was asked to provide an affidavit in support of Michael's case, she was involved in a romantic relationship with Michael.  Michael told DePoy "he was aware" of a letter she wrote to Mr. Rogers regarding Fielstra.  Michael asked that DePoy meet with his attorney about the letter.  At that point, DePoy met with Michael's attorney who advised DePoy that he needed an affidavit to indicate she met with Ms. Chesney and Mr. Rogers while Fielstra was still employed at Fruitport.  (Exhibit Q at 20-23).

DePoy testified that at some point in time, she saw a Facebook post claiming Michael was engaged in sexual relations with a teacher. DePoy testified she met with Ms. Chesney following her observation of the Facebook post. DePoy testified this meeting occurred before she wrote her October 8, 2015 letter to Mr. Rogers. DePoy does not recall with **any** specificity as to when she met with Ms. Chesney. However, she agreed the Facebook message she described was posted when the Fielstra situation "all came to light." She further agreed this occurred at about the same time the police became involved in August, 2015. DePoy testified that her meeting with Ms. Chesney did not last long and that Ms. Chesney conveyed to her that she was already aware of the situation. DePoy agreed this was reasonable if the police investigation had already commenced. (Exhibit Q at 29-32, 34, 49).

DePoy testified that she had previously observed Fielstra working in the library at Fruitport, but at the time did not know who Fielstra was. DePoy agreed that she did not see Fielstra around for a while before she wrote her letter. Oddly, she later testified that she had never seen Fielstra inside the school itself. She only recalled seeing Fielstra outside the school **on one occasion on October 8, 2015.** According to DePoy, on that date she saw Fielstra walking on the sidewalk outside the school. (*Id.* at 27-28, 44).

## LAW AND ARGUMENT

### IV.    STANDARD OF REVIEW

Defendants move this Court to grant summary judgment pursuant to FRCP 56(c). Plaintiff alleges four claims: (1) violation of Title IX; (2) violation of the equal protection clause pursuant to 42 U.S.C. § 1983; (3) violation of the Michigan Elliott-Larsen Civil Rights Act ("ELCRA"); and (4) negligent hiring, supervision and retention. There is no competent evidence to support any of these claims.

Summary judgment is proper "if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). . . .  A dispute is "genuine" only if based on evidence upon which a reasonable jury could return a verdict in favor of the non-moving party. *Hedrick v. W. Reserve Care Sys.,* 355 F.3d 444, 451 (6th Cir. 2004).

## V.  NO BASIS EXISTS FOR LIABILITY UNDER TITLE IX[2]

Title IX provides that "[n]o person . . . shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."  20 U.S.C. § 1681(a).  Title IX impliedly provides for a right of action for monetary damages.  *Gebser v. Lago Vista Ind. Sch. Dist.*, 524 U.S. 274, 280-81 (1998).  A plaintiff may bring an action for sexual harassment or abuse under Title IX.  *Williams ex rel. Hart v. Paint Valley Local Sch. Dist.*, 400 F.3d 360, 363 (6th Cir. 2005).  To establish a prima facie claim under Title IX, plaintiff must present evidence of the following elements:

> [U]nder Title IX, a plaintiff must establish . . . :1) she was subjected to *quid pro quo* sexual harassment or a sexually hostile environment; b) she provided **actual notice of the situation to an "appropriate person,"** who was, at a minimum, an official of the educational entity with authority to take corrective action and to end discrimination; and c) the institution's response to the harassment amounted to **"deliberate indifference."**

*Klemencic v. Ohio State Univ.,* 263 F.3d 504, 510 (6th Cir. 2001) (emphasis added).  Fruitport is not liable for independent acts of its employees or students.  Michael must prove the school district, as the recipient of federal funds, is directly at fault by showing actual knowledge of the harassment by an official with authority to impose remedial measures and an intentional decision to not intercede.  *Gebser*, 524 U.S. at 277, 285, 287-288, 290, 292-293.  Principles of vicarious

---

[2] In addition to Fruitport as an entity, Michael alleges Title IX violations against Superintendent Szymoniak, Ms. Chesney, and Mr. Rogers.  Title IX does not authorize claims against individual administrators or employees.  *See Stiles ex rel. D.S. v. Grainger Cnty., Tenn.*, 819 F.3d 834, 849 (6th Cir. 2016) (quoting *Fitzgerald v. Barnstable*, 555 U.S. 246, 257 (2009)).  Therefore, the Title IX claims against the individual defendants should be dismissed.

liability do not apply. *Id.*

A.  Fruitport did not have "actual notice" until months after Fielstra resigned.

Fruitport is not liable because Michael cannot establish that an appropriate person had actual notice of a substantial risk of abuse until **after** Fielstra resigned. To establish actual notice of a substantial risk of abused under Title IX, Michael must establish that an "appropriate person" had notice of that risk and "an opportunity to rectify any violation." *Gebser*, 524 U.S. at 290. "An 'appropriate person' under § 1682 is, at a minimum, an official of the recipient entity with authority to take corrective action to end the discrimination." *Id.*

To establish actual notice under Title IX, it is insufficient merely to show that Fruitport was on notice of some inappropriate behavior. *Gebser*, 524 U.S. at 291-92. Rather, the "appropriate person" must be on notice of a **substantial risk of the actual type of abuse that would provide for liability under Title IX.** *See id.* In *Gebser*, the Supreme Court observed that a parent's complaint that a teacher made "inappropriate comments" during class was insufficient to alert a school official to the possibility that the teacher was engaged in a sexual relationship with a student. *Id.* at 292. The Sixth Circuit in *Henderson v. Walled Lake Consolidated Schools*, 469 F.3d 479, 490 (6th Cir. 2006), held that a teacher's "communications at odd hours, inappropriate counseling, unchaperoned off-campus activities and inappropriate interactions with team members" did not "hint[ ] at the existence of a hostile environment."

There is no evidence to support Michael's contention that Fruitport had actual knowledge. The evidence demonstrates Michael actively worked to conceal the relationship from Fruitport by lying to administrators and staff at every opportunity. Before the Fruitport Police Department became involved in August of 2015 (months after Fielstra resigned), the only information available to Fruitport staff was not sufficient to put an appropriate person on actual

notice.  First, about a week before prom, a notification appeared on Michael's phone from an unidentified person named "Sandy" while Ms. Chesney was searching Michael's backpack. During the search, Ms. Chesney testified she found body lotion in Michael's backpack.  Ms. Chesney asked Michael about the lotion and he told her it was a Mother's Day gift.  Michael claims the lotion Ms. Chesney discovered was sexual lubricant.  Even if this were true, Michael admitted it would be reasonable for Ms. Chesney to assume this lotion could have been for use with a teenage girl.

On April 27, 2015, the Monday after prom, Ms. Chesney received a call from Mr. Wahr reporting that he observed Michael and Fielstra parked alongside a public road during daylight hours.  On April 28, 2015, Ms. Chesney and Superintendent Szymoniak interviewed Michael and Fielstra regarding Mr. Wahr's report.  Both said Fielstra was a family friend who was giving Arvey a ride home and returning a cell phone charger.  Ms. Chesney and Superintendent Szymoniak had no reason to question the veracity of the story and did not believe anything inappropriate was ongoing.

After the interviews, Ms. Chesney contacted Mrs. Arvey and asked her to follow up by looking through Michael's phone.  Mrs. Arvey testified that she did so.  On May 1, 2015, Mrs. Arvey spoke with Ms. Chesney for a second time and told Ms. Chesney she did not locate anything indicating any inappropriate contact with Fielstra.  **Additionally, Mrs. Arvey told Ms. Chesney that Mr. Wahr's report was not reliable and that she believed her son.**  Ms. Chesney recalled that Mrs. Arvey seemed upset with her for accusing her son of some sort of inappropriate relationship.  Superintendent Szymoniak and Ms. Chesney agreed their was no merit to the complaint and concluded the investigation.

Less than two weeks later, on May 12, 2015, Fielstra resigned.  Fruitport received **no**

**further information** regarding the relationship between Arvey and Fielstra until, at the earliest, August 24, 2015, when the Fruitport Police Department began its investigation.

The facts in two Sixth Circuit opinions, *Henderson*, *supra*, and *Campbell v. Dundee Community Schools*, 661 Fed.Appx. 884 (6th Cir. 2016), support a finding that Fruitport did not have actual notice.   In *Henderson*, the girls' high school soccer team coach engaged in a pattern of abnormal behavior towards his team.   469 F.3d at 484.   The school was made aware of the behavior which included: calling players and sending them emails at unusual hours, engaging in inappropriate counseling sessions, taking them on unchaperoned off-campus activities, and other inappropriate interactions with female team members.   *Id.* at 485.   Unbeknownst to the school, the defendant was engaged in sexual contact with at least one player before and after the district learned on the coach's peculiar behavior.   *Id.*   The Sixth Circuit rejected the notion that the coach's odd behavior could constitute actual knowledge:   "Yet, as the district court also observed, nothing among the concerns that prompted the meeting or the matters discussed at the meeting (i.e., communications at odd hours, inappropriate counseling, unchaperoned off-campus activities, and inappropriate interactions with team members) hinted at the existence of a hostile environment."   *Id.* at 490.

In *Campbell*, the Sixth Circuit relied on the reasoning in *Henderson* to find no actual knowledge in another teacher-on-student sexual assault case.   In *Campbell*, plaintiff was a member of the girls' basketball team and began a secret sexual relationship with the coach, Richard Neff.   661 Fed.Appx. at 886.   In 2009, Neff began a sexual relationship with plaintiff. *Id.*   After the relationship began, parents complained to the athletic director that Neff was sitting on the back of the bus when the team traveled and was texting and calling the players directly. *Id.*   Additionally, the athletic director learned that the plaintiff was "in love" with Neff and that

"her infatuation was causing friction among team members." *Id.* Plaintiff's own father was an assistant coach on the basketball team during the relevant time period, but did not suspect or observe an improper relationship. *Id.*

The Sixth Circuit affirmed the grant of summary judgment to the school district on the issue of actual notice:

> The plaintiff argues that actual notice of a substantial risk of sexual harassment or abuse was provided to school officials in a number of ways. These indications include: Neff's habit of sitting in the back of the bus with the girls on the team; Neff texting and calling the girls on their cell phones; Jane Doe's "crush" on Neff; and the school custodian having a "weird feeling" about Neff and Doe's relationship, which the custodian did not report until after the relationship was discovered. Director Carner spoke to Neff about the behavior after receiving parent complaints, but neither the complaints nor Carner's talk with Neff show any indication that there was a risk of a sexual relationship between Neff and Doe. The complaints were related to preserving the "team dynamic" by not showing favoritism. **Under the actual notice standard, the plaintiff must be able to show that the authority figures were on notice of a substantial risk of the actual type of harassment that occurred.** *See Davis*, 526 U.S. at 654, 119 S.Ct. 1661. "**Communications at odd hours, inappropriate counseling, unchaperoned off-campus activities, and inappropriate interactions with team members**" do not provide notice that sexual harassment is occurring. *Henderson v. Walled Lake Consol. Schools*, 469 F.3d 479, 490 (6th Cir. 2006). **Doe and Neff intended to keep the relationship secret, and did so successfully until they were caught. Even Doe's father, who was also coaching the team, was fooled.** This fact gives rise to the inference that the other observers with more distant relationships to Doe were not at fault when they did not take action to remedy or report the unknown sexual activity. The custodian's later reporting that he had a completely internal and undiscussed "weird feeling" is not a basis for liability.

*Campbell*, 661 Fed.Appx. at 888-889 (emphasis added).

Michael claims that Fruitport should have known something was going on between he and Fielstra. This theory is not cognizable under relevant Title IX case law. Judge Jonker rejected a similar argument in *Irvin v. Grand Rapids Public Schools*, 366 F.Supp.3d 908, 919 n.4 (W.D. Mich. 2016). In *Irvin*, the plaintiffs alleged that the risk of sexual abuse by a teacher should have been obvious to the administrators because "'it was their job to know.'" *Id.* Judge

Jonker rejected this reasoning, noting that claims of this nature fail "as a matter of law to show that Defendants had actual notice." *Id.* He reasoned that Title IX requires actual notice "not constructive notice." *Id.*

The uncontroverted evidence demonstrates that Fruitport did not have actual notice until months after Fielstra resigned.

B.    Fruitport was not deliberately indifferent to the information it received.

Even if the information Fruitport learned could constitute actual notice, the district was not deliberately indifferent. Fruitport is "liable for damages only where the recipient itself intentionally acted in clear violation of Title IX by remaining deliberately indifferent to known acts of harassment." *Vance v. Spencer Cty. Public Sch. Dist.*, 231 F.3d 253, 260 (6th Cir. 2000). Deliberate indifference is shown only where the official responds to known acts of discrimination in a "clearly unreasonable" manner in light of the known circumstances. *Davis v. Monroe Cnty. Bd. Of Educ.*, 526 U.S. 629, 648 (1999). To establish deliberate indifference, it is not enough for Arvey to show that the individuals were sloppy, reckless, or negligent in the performance of their duties. Rather, Arvey must show that the "defendants' conduct amounted to a tacit authorization of the abuse." *Doe v. Claiborne Cnty., Tenn.*, 103 F.3d 495, 513 (6th Cir. 1996). The district's response must not be viewed with the benefit of hindsight. *McCoy v. Bd. Of Educ., Columbus City. Schs.*, 515 Fed.Appx. 387, 392 (6th Cir. 2013). Rather, the district's response must be viewed "in light of available information" when determining whether the district was deliberately indifferent. *Id.* at 391.

Fruitport was not deliberately indifferent to the information it received. When Ms. Chesney received Mr. Wahr's report, she immediately contacted Superintendent Szymoniak for guidance. Less than a day later, Superintendent Szymoniak and Ms. Chesney interviewed

Michael and Fielstra.   While the information indicated that Fielstra may have acted unprofessionally by transporting a student on a weekend, there was no indication from either interview that any conduct occurred that could lead to Title IX liability.

Superintendent Szymoniak reminded Fielstra that it was improper to transport students outside of the bounds of a school-related function.   Additionally, Ms. Chesney relayed Mr. Wahr's complaint to Mrs. Arvey for further investigation.   That investigation, **by Michael's own family**, found no reason for alarm.

After Fielstra resigned, there was nothing more that Fruitport could have done to remedy the situation.   Considering the innocuous information Fruitport had at the time, the district's response was not deliberately indifferent.

## VI.   THERE IS NO BASIS FOR INDIVIDUAL OR MUNICIPAL LIABILITY UNDER § 1983.

Michael claims that Fruitport, Superintendent Szymoniak, Ms. Chesney, and Mr. Rogers violated his Constitutional rights under the Fourteenth Amendment.   There is no basis to find liability against either the individual defendants or the school district.

### A.   Michael cannot provide evidence to support his claim for individual liability.

To establish individual liability under § 1983, Michael must show that "'the supervisor encouraged the specific incident of misconduct or in some other way directly participated in it,' or 'at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending subordinate.'"   *Leary v. Daeschner*, 349 F.3d 888, 903 (6th Cir. 2003) (quoting *Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir. 1984), *cert. denied*, 469 U.S. 845 (1984)).   Liability "must be based on more than the right to control employees. Likewise, simple awareness of employees' misconduct does not lead to supervisor liability." *Id.* (internal citation and quotation marks omitted).

In the educational context, Michael "must show that, in light of the information the defendants possessed, the teacher who engaged in sexual abuse showed a strong likelihood that he would attempt to sexually abuse other students, such that the failure to take adequate precautions amounted to deliberate indifference to the constitutional rights of students." *Doe v. City of Roseville*, 296 F.3d 431, 439 (6th Cir. 2002). Michael must establish that the "defendants' conduct amounted to a tacit authorization of the abuse." *Claiborne*, 103 F.3d at 513 (citation omitted). "[L]iability must be based on **active unconstitutional behavior**, and . . . a mere failure to act [is] not sufficient." *Roseville*, 296 F.3d at 440 (emphasis added). "In the absence of any allegation that the supervisors had 'participated, encouraged, authorized or acquiesced in' the offending conduct, we held that the supervisors had, as a matter of law, 'neither committed a constitutional violation nor violated a clearly established right.'" *Id.* (citing *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir.1999)). Importantly, the deliberate indifference standard used for proving a § 1983 violation is "'substantially the same'" as the deliberate indifference standard applied in Title IX cases. *See Stiles ex rel. D.S. v. Grainger Cnty, Tenn.*, 819 F.3d 834, 852 (6th Cir. 2016) (quoting *Paint Valley Local Sch. Dist.*, 400 F.3d at 369 (applying the standard in a § 1983 equal protection violation in a peer harassment case).

While Michael alleges claims against the individual defendants, no allegations or evidence is available to show what exactly the individuals did wrong. He merely alleges that the defendants had notice and knowledge of the dangers faced by male students from Fielstra and that the defendants provided Fielstra with unsupervised access to "court, harass and groom young men, including Plaintiff, while at school . . . ." (First Amended Complaint, ECF No. 30, PageID.126-127). There is no evidence that Superintendent Szymoniak, Ms. Chesney, or Mr. Rogers actively engaged in any unconstitutional conduct. Neither Superintendent Szymoniak,

Ms. Chesney, nor Mr. Rogers encouraged the specific incident of misconduct or in some other way directly participated in it." *Claiborne*, 103 F.3d at 513.  None of the individual defendants were aware of Fielstra's behavior until months after she resigned.  At the time they received Mr. Wahr's report, they investigated and received information from all individuals interviewed that nothing improper was afoot.  Fielstra was counseled to not transport students in her personal vehicle.  There is no basis for individual liability.

      B.    <u>Fruitport cannot be held liable under a *Monell* theory of recovery.</u>

There is no evidence to support a § 1983 claim against Fruitport.  Michael has not alleged a violation of procedural due process and a substantive due process claim cannot survive because *respondeat superior* liability and vicarious liability do not exist under § 1983.  *Monell v Dept. of Soc. Services*, 436 U.S. 658, 691, 98 S.Ct. 2018, 2036 (1978).  Michael must prove Fruitport, **itself**, through an official act, policy, or custom intentionally violated his constitutionally protected right.  *Monell, supra,* 436 U.S. at 691.  In *Claiborne County*, the Sixth Circuit said:

> Under *Monell*, . . . the board cannot be found liable unless the plaintiff can establish that an officially executed policy, or the toleration of a custom within the department leads to, causes, or results in the deprivation of a constitutionally protected right. *Monell,* 436 U.S. at 690-91.
>
>                   \*                    \*                  \*
>
> [A] "custom" for purposes of *Monell* liability must "be so permanent and well settled as to constitute a custom or usage with the force of law."  *Monell*, 436 U.S. at 691.  It must reflect a course of action deliberately chosen from among various alternatives. (citation omitted)  In short, a "custom" is a "legal institution" not memorialized by written law. (citation omitted).

103 F.3d at 507-508.

A plaintiff "must show that the particular injury was incurred because of the execution of that policy.  This requirement is necessary to avoid de facto *respondeat superior* liability

explicitly prohibited by *Monell*." *Id. See also*, *Paint Valley Local Sch. Dist.,* 400 F.3d at 368-369. In the present case, there is no evidence showing a policy or custom of Fruitport allowing or condoning sexual harassment or that plaintiff suffered a particular injury because of a custom or policy.

Michael appears to allege a custom of inaction. To establish a custom of inaction, he must show: (1) the existence of a clear and persistent pattern of sexual abuse by school employees; (2) notice or constructive notice on the part of Fruitport; (3) Fruitport's tacit approval of the unconstitutional conduct, such that their **deliberate indifference** in their failure to act can be said to amount to an official policy of inaction; and (4) that Fruitport's custom was the "moving force" or direct causal link in the constitutional deprivation. *Claiborne*, 103 F.3d at 508. The Sixth Circuit has held that a finding of no deliberate indifference on a Title IX claim **is fatal to a companion § 1983 municipal liability claim.** *See McCoy*, 515 Fed. Appx. at 393 (citing *Henderson*, 469 F.3d at 492). Michael's inability to prove deliberate indifference on the Title IX claim defeats his § 1983 claim. Additionally, Michael has not and cannot present any evidence of a persistent pattern of sexual abuse by school employees.

Michael also alleges a failure to train theory. This is similarly unpersuasive. To succeed on a failure to train or supervise claim, he must prove: "(1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's **deliberate indifference**; and (3) the inadequacy was closely related to or actually caused the injury." *Ellis ex rel. Pendergrass v. Cleveland Min. School Dist.*, 455 F.3d 690, 700 (6th Cir. 2006). Even if Michael could present evidence of inadequate training – which he cannot – there is no basis upon which to conclude that Fruitport was deliberately indifferent. The Supreme Court in *Connick v. Thompson*, 563 U.S. 51, 61 (2011), noted, "[a] municipality's culpability for

a deprivation of rights is at its most tenuous where a claim turns on a failure to train."

"'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor

disregarded a known or obvious consequence of his action." *Id.* (quoting *Bryan Cty.*, 520 U.S. at

410). **Evidence of a pattern of similar constitutional violations by untrained employees is**

**"ordinarily necessary" to demonstrate deliberate indifference for purposes of failure to**

**train.** *Connick*, 563 U.S. at 60-61 (citing *Bryan Cty.* 520 U.S. at 409).  The Supreme Court

reasoned:

> Policymakers' "continued adherence to an approach that they know or should
> know has failed to prevent tortious conduct by employees may establish the
> conscious disregard for the consequences of their action—the 'deliberate
> indifference'—necessary to trigger municipal liability." [*Bryan Cty.*, 520 U.S. at
> 407]. **Without notice that a course of training is deficient in a particular**
> **respect, decisionmakers can hardly be said to have deliberately chosen a**
> **training program that will cause violations of constitutional rights.**

*Connick*, 563 U.S. at 62 (emphasis added).

There can be no dispute that at all relevant times, Fruitport had published sexual

harassment policies and procedures.  Fielstra testified that she received and reviewed Fruitport's

sexual harassment policy.  Additionally, she received training from PESG on sexual harassment.

More importantly, Michael has not adduced any evidence of other instances of sexual harassment

and/or assault at Fruitport.  This lack of a pattern of ignored constitutional violations dooms his

failure to train claim.  The Supreme Court has clearly instructed that a municipality's culpability

is at its most tenuous point when a plaintiff alleges failure to train.  The hallmark of failure to

train is a pattern of similar rights violations.  No such pattern exists here.

Finally, to the extent Michael alleges a substantive due process complaint, his claims are

equally infirm.  Generally, the state has no obligation to protect the life, liberty, of property of its

citizens against invasion by private actors. *Stiles*, 819 F.3d at 853 (citing *DeShaney v.*

*Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 195 (1989)). There are two exceptions to this rule: (1) when the state enters into a "special relationship" with an individual by taking that person into its custody, and (2) when the state creates or increases the risk of harm to an individual. *Stiles*, 819 F.3d at 853 (citing *DeShaney* 489 U.S. at 199-201). Plaintiff has not pled either exception. Even if he had, neither apply. The Sixth Circuit has expressly and consistently rejected the existence of a special relationship between a school official and a student. *See Stiles*, 819 F.3d at 845; *see also Claiborne Cnty.*, 103 F.3d at 510 (holding that "a state's compulsory attendance laws do not sufficiently 'restrain' students to raise a school's common law obligation [to maintain a safe school environment] to the rank of a constitutional duty"). Further, in order for the "state created danger" exception to apply, plaintiff must establish three elements: (1) an affirmative act that creates or increases the risk to the plaintiff, (2) a special danger to the plaintiff as distinguished from the public at large, and (3) the requisite degree of state culpability. *McQueen v. Beecher Cmty. Schs.*, 433 F.3d 460, 464 (6th Cir.2006). Michael has not pled, let alone uncovered any evidence, of any affirmative action by any individual defendant that created or increased any risk to plaintiff. Rather, Michael asserts omissions by the defendants which do not suffice. *See Stiles*, 819 F.3d at 855.

## VII.     NO BASIS EXISTS FOR LIABILITY UNDER ELCRA

The evidence does not support an ELCRA claim. Fruitport did not prevent Michael from utilizing the benefits, services, activities, or programs provided by the districts "because of . . . sex." MCL 37.2402. As an initial matter, Fruitport is not strictly liable for Fielstra's misconduct. The Michigan Supreme Court held, in *Hamed v. Wayne County*, 490 Mich 1; 803 NW2d 237 (2011), traditional agency principles apply to ELCRA and no vicarious liability exists for criminal acts of an agent.

Nevertheless, Michael also alleges a hostile environment claim.  In *Henderson*, the Sixth

Circuit described a hostile environment claim as follows:

> [P]laintiff must prove the following elements by a preponderance of the evidence:
> (1) that she belonged to a protected group; (2) that she was subjected to
> communication or conduct on the basis of sex; (3) that she was subjected to
> unwelcome sexual conduct or communication; (4) that the unwelcome sexual
> conduct or communication was intended to or in fact did substantially interfere
> with plaintiff's educational opportunities or created an intimidating, hostile, or
> offensive educational environment; and (5) *respondeat superior*. *Chambers v.
> Trettco, Inc.*, 463 Mich. 297, 311, 614 N.W.2d 910 (2000).
>
> *      *      *
>
> *Respondeat superior* liability can be imposed on an employer for an employee's
> hostile environment harassment "only if the employer had reasonable notice of
> the harassment and failed to take appropriate corrective action." *Id.* at 311, 614
> N.W.2d 910; *Elezovic v. Ford Motor Co.*, 472 Mich. 408, 426, 697 N.W.2d 851
> (2005). "[N]otice of sexual harassment is adequate if, by an objective standard,
> the totality of the circumstances were such that a reasonable employer would have
> been aware of a substantial probability that sexual harassment was occurring." *Id.*
> at 426, 697 N.W.2d 851.

*Henderson*, 469 F.3d at 487-488.

First, Michael was a willing participant in the relationship.  He was not the victim of

unwelcome sexual conduct or communication.  Further, Fruitport did not have any notice of the

alleged sexual harassment.  As discussed *supra*, Michael and Fielstra engaged in a coordinated

effort to hide the relationship.  Michael testified he did everything he could to hide what was

going on.  The innocuous information available to Fruitport was not sufficient to make a

reasonable employer aware that sexual harassment was occurring.

Finally, Fruitport took prompt and appropriate remedial action in response to the

information it received that Fielstra was parked in a car with Michael.  To determine whether an

employer has taken prompt and appropriate remedial action, "the relevant inquire concerning the

adequacy of the employer's remedial action is whether the action reasonably served to prevent

30

future harassment of the plaintiff." *Chambers v. Trettco, Inc.*, 463 Mich. 297, 311 (2000).  The Sixth Circuit has explained, "[t]he most significant immediate measure an employer can take in response to a sexual harassment complaint is to launch a prompt investigation to determine whether the complaint is justified." *Collette v. Stein-Mart, Inc.*, 126 Fed.Appx. 678, 687-688 (6th Cir. 2005).  Fruitport immediately investigated Mr. Wahr's report.  Despite finding no evidence of an inappropriate relationship, Superintendent Szymoniak advised Fielstra to avoid transporting students.  Less than two weeks later, Fielstra resigned on May 12, 2015.

## VIII.   FRUITPORT IS IMMUNE FROM MICHAEL'S TORT CLAIMS.

Michael alleges that Fruitport was negligent in the hiring, supervision, and retention of Fielstra.  Under the Michigan Governmental Tort Liability Act ("GTLA"), neither the school district nor its employees are liable in tort unless an exception to governmental immunity applies.  The operation of a public-school system is a governmental function and the school district and its employees are immune from tort liability, unless an exception to governmental immunity applies.  *See Stringwell v Ann Arbor Pub Schs*, 262 Mich App 709 (2004).  The GLTA, at MCL 691.1407(1) provides:

> Except as otherwise provided in this act, a governmental agency is immune from tort liability if the governmental agency is engaged in the exercise or discharge of a governmental function . . . .

The immunity from tort liability provided by MCL 691.1407(1) is expressed in the broadest possible language, extends to all governmental agencies, and applies to all tort liability when the governmental agencies are engaged in the exercise or discharge of a governmental function.  *Nawrocki v Macomb Co Rd Com'n*, 463 Mich 143, 156 (2000).  The scope of governmental immunity is broad and any exceptions are to be **narrowly construed**.  *Robinson v City of Detroit*, 462 Mich 439, 455 (2000).  Michael bears the burden of alleging and proving

facts which demonstrate application of an exception to governmental immunity. *Mack v City of Detroit*, 467 Mich 186, 198 (2002).

To avoid summary judgment, Michael is required to allege and provide evidence of facts warranting application of an exception to governmental immunity. *Smith v Kowalski*, 223 Mich App 610, 616 (1997). There are six exceptions to this blanket immunity under which a governmental agency may be liable in tort: (1) failure to maintain highways, MCL 691.1402; (2) negligent operation of a government-owned vehicle, MCL 691.1405; (3) ownership or operation of a governmental hospital, MCL 691.1407(4); (4) performance of a proprietary function, MCL 691.1413; (5) negligent failure to maintain or repair a public building, MCL 691.1406, and; (6) sewage disposal system event, MCL 691.1417. *See Lash v Traverse City*, 479 Mich 180, 195 n 33 (2007).

The gross negligence exception set forth at MCL 691.1407(2) applies only to claims against individuals. It does not provide a basis for holding a governmental agency liable. *See Gracey v Wayne County Clerk*, 213 Mich App 412, 420 (1995), overruled on other grounds by *American Transmissions, Inc v Attorney Gen*, 454 Mich 135 (1997).

The principles of vicarious liability do not apply. Vicarious liability can only be imposed on a governmental agency "when its **officer, employee, or agent, acting during the course of employment and within the scope of authority**, commits a tort while engaged in an activity that is nongovernmental or proprietary or that **falls within a statutory exception.**" *Gracey*, *supra*, at 421 (emphasis added).

Michael's claims for negligent hiring, supervision, and retention do not fall within any of the six statutory exceptions above. As such, there is no basis for tort liability against Fruitport.

# CONCLUSION

For the reasons stated, this Court should dismiss Michael's claims against Fruitport Community Schools, Superintendent Szymoniak, Ms. Chesney, and Mr. Rogers with prejudice. There is no evidence showing that Fruitport had actual knowledge until after the police were involved or that Fruitport was deliberately indifferent to Fielstra's alleged conduct. Michael and Fielstra acted in concert to hide their relationship from Fruitport, law enforcement, and their families. The failure of Michael's Title IX claim is fatal to his constitutional claims. Nor does the evidence support either of his state law claims.

<div style="margin-left:40%">

KLUCZYNSKI, GIRTZ & VOGELZANG
Attorneys for Defendants

</div>

Dated: June 27, 2019                    By: /s/ Mark T. Ostrowski_____
                                            Mark T. Ostrowski (P49761)
                                            Bogomir Rajsic, III (P79191)
                                        Business Address and Telephone:
                                            5005 Cascade Road, SE, Suite A
                                            Grand Rapids, MI 49546
                                            616-559-8600

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that the foregoing brief complies with the type-volume limitations pursuant to W.D. Mich. LCivR 7.2(b)(ii) because this brief contains 10,747 words, excluding those parts of the brief excluded by W.D. Mich. LCivR 7.2(i). This brief was prepared using Microsoft Word 365.

KLUCZYNSKI, GIRTZ & VOGELZANG
Attorneys for Defendants

Dated: June 27, 2019                 By: <u>/s/ Mark T. Ostrowski</u>
                                       Mark T. Ostrowski (P49761)
                                       Bogomir Rajsic, III (P79191)
                               Business Address & Telephone:
                                         5005 Cascade Road S.E., Suite A
                                       Grand Rapids, MI 49546
                                       (616) 559-8600

---

**PROOF OF SERVICE**

The undersigned certifies that the foregoing instrument was served upon all parties to the above cause via the ECF electronic filing system for the Western District of Michigan.

Dated: June 27, 2019                            Signed: <u>/s/ Lynn Lewis</u>